IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF DEVICES SEIZED FROM DERRICK LOI ON FEBRUARY 24, 2023 | Case No. 6:23MJ00012 <br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Jason P. McCoy, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the cellular device and laptop computer seized from Derrick Loi on February 24, 2023, and described in **Attachment A** of this affidavit (the "SUBJECT DEVICES"), specifically the contents of the devices, for contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2422, 2251, 2252, and 2252A, more specifically described in **Attachment B** of this affidavit.

2. Your affiant is a law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code. I have been employed with the FBI since July 2019 and as a law enforcement officer since 2007. Prior to joining the FBI, I was a Special Agent with the United States Air Force Office of Special Investigations and began conducting federal criminal investigations after completing the Federal Law Enforcement Training Center's Criminal Investigator Training Program in September 2013. I have extensive experience investigating a myriad of crimes, including criminal and national

1

security investigations. As an FBI SA I have received extensive training in the investigation of violations of federal and state law. I am currently assigned to the FBI Richmond Division, Lynchburg Resident Agency, where as part of my duties, I investigate criminal violations relating to child exploitation, to include enticement, in violation of 18 U.S.C. § 2251 and 18 U.S.C. § 2422, as well as child pornography, including violations pertaining to the illegal production, distribution, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2252(a), and 2252A. I have experience in the area of child pornography and child sexual exploitation investigations and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media. I also have experience in interviewing and IN interrogation techniques, arrest procedures, search warrant applications, the execution of searches, and various other criminal laws and procedures. I have personally participated in the execution of search warrants involving the search and seizure of computer and digital equipment.

3.  As an FBI agent, I am authorized to conduct investigations, carry firearms, execute warrants, make arrests, and perform other duties sanctioned by the FBI. Over the course of my career, I have conducted interviews and secured other relevant information, using a variety of investigative techniques. I am a federal law enforcement officer under the applicable provisions of the U.S.C. and under Rule 41(a) of the Federal Rules of Criminal Procedure. As a result, I am authorized to apply for this search warrant.

4.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      As set forth below, there is probable cause to believe that that contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2422; (enticement of an individual who as not attained the age of 18); 2251(A) (production of child pornography), 2252(a)(2) and (b)(1) (receipt or distribution of a visual depiction of a minor engaged in sexually explicit conduct); 2252(a)(4)(B) and (b)(2) (possession of and access with intent to view a visual depiction of a minor engaged in sexually explicit conduct); and 18 U.S.C. § 2252A(a)(5)(B) and (b)(2) (possession of and access with intent to view child pornography) are presently located on the SUBJECT DEVICES.

**DEFINITIONS**

6.      The following definitions apply to this affidavit:

   a.      "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

   b.      "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

   c.      "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

  d. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

  e. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

  f. "Encryption" is the process of converting data into a code in order to prevent unauthorized access to the data.

  g. "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly to another location in a hypertext document or to some other web page.

  h. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

    i.  A "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

    j.  "Discord" is a free communications app that allows its users to share voice, video, and text chat with persons on the Internet as well as browse and share any website content with those whom the user selects while still within the Discord platform. Unlike other messaging apps, Discord usernames - not phone numbers - are the basis for Discord user accounts. Discord usernames are unique, can never be replicated, and are the only publicly available identifier Discord can use to identify a Discord account to law enforcement. The company cannot identify users using phone numbers, first and last name (display name), or email address.

    k.  "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

    l.  An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most ISPs control a range of IP addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique

number to a computer or device every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

      m.    "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

### BACKGROUND ON CHILD PORNOGRAPHY AND COMPUTERS

7. I have had both training and experience in the investigation of computer-related crimes and child pornography crimes. Based on my training, experience, knowledge, and the knowledge of more experienced agents, I know the following:

      a.    Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

      b.    Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards are often large enough to store thousands of high-resolution photographs or videos.

      c.    A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Mobile devices such

as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively, and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

  d. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types - to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer - can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

  e. The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

  f. Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where

online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

      g.     Smartphones and other mobile computing devices use mobile applications, also referred to as "apps." Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or playing a game – on a mobile device. Individuals commonly use such apps to receive, store, distribute, and advertise child pornography, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-storage services where child pornography may be stored.

      h.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (i.e., by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

### CHARACTERISTICS COMMON TO INDIVIDUALS WHO ACCESS WITH INTENT TO VIEW CHILD PORNOGRAPHY

8.     Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have

had discussions, I know there are certain characteristics common to individuals who access online child sexual abuse and exploitation material via the Internet:

  a. Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

  b. Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

  c. Such individuals almost always possess and maintain child pornographic material in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain those materials and child erotica for many years.

  d. Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly. Some of these

individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

   e. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.

   f. Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain contact information (e.g., online messaging accounts, email addresses, etc.) of individuals with whom they have been in contact and who share the same interests in child pornography.

   g. Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

   h. Even if the target uses a portable device (such as a mobile phone) to access the Internet and child pornography, it is more likely than not that evidence of this access will also be found on digital devices other than the portable device (for reasons including the frequency of "backing up" or "syncing" mobile phones to computers or other digital devices).

## **CASE BACKGROUND AND PROBABLE CAUSE**

9.     On February 24, 2023, at approximately 10:25 PM, I received a call from the Lynchburg Police Department notifying me that the Lynchburg Communications Center received a report that 28-year-old Derrick Loi had traveled from the state of New York for the purpose of engaging in sexual intercourse with a 14-year-old female (the "victim"). The complainant stated that Loi was waiting to meet the victim on McVeigh Road in Lynchburg, Virginia, which is within the Western District of Virginia. Loi told the victim he would take her to a Quality Inn to have sex. Officers from the Lynchburg Police Department responded to the victim's address to make contact with her while additional officers responded to McVeigh Rd, where Loi was parked. Loi was initially identified by a photograph provided to Officers by the victim and later was fully identified as 26-year-old Derrick Loi of Lakeville, NY. Officers placed him into investigative detention.

10.    Officers learned from the victim that she and Loi had been in communication for approximately two and a half weeks via Discord. Officers were provided consent to search the victim's laptop by her father. On the laptop, the officers reviewed the Discord profile associated with username NicoleIO#XXXX but did not observe any communications between the victim and Loi. The victim stated she had deleted the conversations prior to the officers' arrival. The victim did not recall Loi's username but did remember it started with the word "call." The victim told the officers that her conversations with Loi were sexual in nature and that Loi asked her to send pornographic photos of herself, which she did. Loi told the victim he wanted to "rape her" and instructed the victim to leave a note saying she was staying at a friend's house. The victim stated to the officers that she told Loi she was 14 years old.

11.    After confirming Loi made a hotel reservation in the Lynchburg area, the Lynchburg police transported Loi to the Lynchburg Police Department, where an interview of Loi

was conducted. During the interview, Loi confirmed he had driven from New York to Lynchburg, Virginia, to meet someone he had been speaking to online. Loi did not recall the username NicoleIO#XXXX and said he believed he was talking to someone named "Katie." Loi told the interviewing officer that his Discord usernames were "LPKensei" and "Callthevoid." Loi stated he and "Katie" discussed "hooking up," but he denied knowing how old she was. Loi stated he had requested and received photographs of a "lewd nature" from "Katie." Loi stated he and "Katie" used the Discord chat, video, and audio features.

12. Once the interview was concluded, the interviewing officer placed Loi under arrest. A Samsung cell phone with IMEI 350319816759476, which was located on Loi's person, was seized by the Lynchburg Police Department.

13. During a search of Loi's vehicle, officers discovered an HP Specter Laptop with Serial Number 5CD0188SN7, two USB thumb drives, a bag containing various sex toys and lubricant, a bag containing a box of condoms, and a Plan B pill used for emergency contraception. Upon opening the trunk area, officers observed a vinyl or rubber shower liner which covered most of the carpeted floor space in the trunk. There was a flattened cardboard box on top of the liner that had a red stain from an unknown substance. Officers also observed large plastic storage bags along the right side of the trunk.

14. On February 28, 2023, I reviewed reports provided by the Lynchburg Police Department and opened an investigation into this matter. The victim's laptop, along with the SUBJECT DEVICES, were transferred to FBI custody, and I sought and obtained written consent from the victim's father to search the contents of the laptop computer that the victim had used to communicate with Loi.

15.     While reviewing the contents of the victim's laptop on March 15, 2023, agents discovered a Discord profile logged into the Discord web browser on the device, which enabled agents to review the associated user's chat history. The username on the account was "kaiteee#XXXX." While reviewing the contents of this account, agents discovered communications with user "Callduvide#XXXX" (Callthevoid; "du vide" is French for the void). These communications made clear that "kaiteee#XXXX" was a Discord profile being used by the victim and that "Callduvide#XXXX" was a Discord profile being used by Loi. Agents observed that on February 14, 2023, the victim, using the "kaiteee#XXXX" username, stated that she was 14 years old. Throughout the conversation, "Callduvide#XXXX" repeatedly requested pornographic images from the victim and discussed traveling from New York to Lynchburg, Virginia, to engage in sexual intercourse with the victim. On February 14, 2023, "Callduvide#XXXX" stated "Ooh I can't wait to try out your kiddie holes…". "Callduvide#XXXX" provided money to the victim in exchange for child pornography and, in one instance, the victim sent images described as herself at the age of 12 years old. "Callduvide#XXXX" suggested he could be her "sugar daddy" and pay her weekly. On February 24, 2023, "Callduvide#XXXX" told the victim "take a pic of ur pussy rn." The victim responded by sending an image depicting herself nude, exposing her genitals.

16.     During the conversation, "Callduvide#XXXX" discussed taking the victim's virginity and discussed the victim taking birth control. He told the victim he was bringing vodka and sex toys. On February 23, 2023, he sent a photograph of sex toys, lubricant, and a "Plan B" box, and on February 24, 2023, he sent a photograph of a vodka bottle. "Callduvide#XXXX" discussed with the victim the possibility of staying in a hotel overnight and questioned the victim about her parents' response if she did not return home. "Callduvide#XXXX" instructed the victim

to tell her parents she was staying with a friend the night she planned to meet him. "Callduvide#XXXX" asked the victim if they could film their sexual encounter when he traveled down to have sex with her and continued by stating "…hopefully I get good footage." On February 24, 2023, he told the victim "I'm so excited to fuck you" and then told the victim when he initially arrived at McVeigh Road. He then left to check into the hotel before returning to McVeigh Road. The final message from "Callduvide#XXXX" was received at approximately 9:41 PM.

17. "Callduvide#XXXX" told the victim that some of the images that she sent were "nothing I haven't seen before." He sometimes referred to the victim as a "seller" and mentioned interacting with other "sellers" on the internet.

18. The facts as outlined above provide me with a reasonable belief that the SUBJECT DEVICES contain evidence that Loi, the user of Discord username "Callduvide#XXXX," produced, possessed, received, and distributed child pornography, by means of the internet, with a minor residing in the Western District of Virginia. There is also a reasonable belief that evidence of Loi's travel from New York to the Western District of Virginia, to engage in sexual intercourse with the victim (a minor), exists on the SUBJECT DEVICES. Lastly, there is a reasonable belief that evidence exists on the SUBJECT DEVICES related to other victims of similar crimes, which could be further identified.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

19. I anticipate executing this warrant on the SUBJECT DEVICES for data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure and search of computers and electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

20. I submit that there is probable cause to believe those child pornography materials will be stored on the computers or storage mediums, for at least the following reasons:

  a. Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

  b. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

  c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

21. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on the SUBJECT DEVICES because: data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices, or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

22. Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and

16

durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.

23. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, computers typically contain information that logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., Internet searches indicating criminal planning), or consciousness of

guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement). A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

24. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

25. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent. I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used;

data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

## CONCLUSION

26. Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B, are located on the SUBJECT DEVICES, which are described in Attachment A. I respectfully request that this Court issue a search warrant for the property described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

27. I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of the SUBJECT DEVICES. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

JASON MCCOY
Digitally signed by JASON MCCOY
Date: 2023.03.22 09:16:45 -04'00'

**Jason P. McCoy**
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me this 22nd day of March, 2023.

*Robert S. Ballou*

The Honorable Robert Ballou
UNITED STATES DISTRICT JUDGE